The appellant, Grady Archie Bankhead, was convicted of the robbery-homicide of Jack David McGraw, a capital offense as defined by § 13A-5-40(a)(10), Code of Alabama 1975. Following a sentence hearing, the jury recommended a sentence of death. The trial court, after complying with § 13A-5-47, Code of Alabama
1975, sentenced the appellant to death by electrocution.
The evidence tended to show that on the morning of May 26, 1986, Jimmy Davenport and his brother-in-law, James Bynum, met Gary Leon Brown and the appellant at the appellant's house and set out to go fishing. They fished for most of the day and drank beer and whiskey while they did so. Around the middle of the afternoon, *Page 99 
the four stopped fishing and went to a bar and drank for about three more hours.
Sometime during the afternoon, Bynum suggested that they go to the trailer of Jack David McGraw. On the way to the trailer, Brown and Bynum talked about killing a "queer," but assured Davenport that all he would have to do was drive. The appellant asked Bynum if he could hit hard and said he wanted Bynum to "take the old guy out with one punch." The appellant also said that if Bynum could not do so, that the appellant could, to which Bynum replied, "I'm sure I can do it. I can hit hard."
When the four men reached the trailer, Davenport stayed in the car. The others got out, walked to the door, and knocked. McGraw answered the door and invited them in; however, they soon came back out. As they were walking out, the appellant grabbed McGraw and threw him to the ground. Bynum and Brown then started punching McGraw, and continued to do so until he was unconscious. The three then pulled him back into the trailer and closed the door.
After about 15 or 20 minutes, the appellant, Bynum, and Brown came out of the trailer carrying various items. They were covered with blood. The appellant told Davenport to "shut up" or he would "get the same as the old man." The four men then left in the car.
They drove to the appellant's house, where they began unloading the items from the car. Among the items stolen were stereo equipment, speakers, a VCR, and a microwave oven. Blanche Bankhead, who was at that time the appellant's wife, overheard the appellant say to Brown, "Are you sure he's dead?" Brown answered, "Yes, I stabbed him and stabbed him and stabbed him. I thought he was dead. He kept trying to get up." The appellant said, "We've got to make sure he's dead."
The appellant's wife also heard the men recreating what had happened. Brown said, "when Archie handed me that knife, he told me to cut — you have to cut his throat." To this, the appellant replied, "You weren't doing it right. I had to take the knife and slice his jugular vein."
While still at the appellant's house, Brown pulled out the victim's wallet; it was decided that the four would divide up the money in it. Then the appellant said that they should burn their clothes, so they made a pile of them, poured gasoline on the pile, and set them afire. Davenport, who looked scared, said "I have got to get out of here." The appellant threatened him, saying that if he told anybody, the appellant would find him.
Later that night, the appellant and Brown went to the apartment of Michael Wayne Lotz and left a television there until the following day, when the appellant removed it. The next day, the appellant left another television at Lotz's apartment. The appellant later told Lotz that Brown had been arrested by the police for a murder in Pinson; that he had gotten the television by robbing a man in Blount County; and that Lotz should take the television to the woods and burn it.
Neighborhood children returning Jack McGraw's dog to his yard discovered his body in his trailer on the afternoon of May 27, 1986. An autopsy revealed numerous stab wounds, including 59 to the back, 16 to the neck area, and three to the face. Both the carotid artery and the jugular vein on the left side of the neck had been cut. All wounds were pre-mortem. The cause of death was loss of blood due to the cut and stab wounds.
On May 29, 1986, the appellant left his house and did not return. He was arrested in Mobile on July 13, 1986, at which time he made a tape-recorded statement to law enforcement officers. He admitted that he had gone to McGraw's trailer with Davenport, Bynum, and Brown for the purpose of robbing McGraw. While they were in the trailer, McGraw emerged from his bedroom and tried to stop them. According to the appellant, Brown then attacked McGraw with a knife, stabbing him to *Page 100 
death.[1]
 I
Appellant contends that the trial court erred when it failed to strike for cause a juror who could not "exercise the presumption of innocence."
Section 12-16-150, Code of Alabama 1975, provides that a juror may be challenged for cause if he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict. "A 'fixed opinion' which will bias a verdict is one that is a conviction or prejudgment, a strong or deep impression which closes the mind of a juror and combats the testimony and resists its force." Nobis v. State,401 So.2d 191, 197 (Ala.Cr.App.), cert. denied, 401 So.2d 204 (Ala. 1981). However, "[a] juror, even though having previously expressed an opinion regarding a defendant's guilt, is not disqualified if he states unqualifiedly that as a juror he can find a true verdict on the evidence alone." Kinder v. State,515 So.2d 55, 60-61 (Ala.Cr.App. 1986); Johnston v. State,497 So.2d 844, 849 (Ala.Cr.App. 1986). Moreover, as stated in Irvinv. Dowd, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 1642,6 L.Ed.2d 751 (1961):
 "It is not required, however, that the juror be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impressions or opinion and render a verdict based on the evidence presented in court. Spies v. Illinois, 123 U.S. 131 [8 S.Ct. 22, 31 L.Ed. 80]; Holt v. United States, 218 U.S. 245
[31 S.Ct 2, 54 L.Ed. 1021]; Reynolds v. United States, supra [98 U.S. 145, 25 L.Ed. 244]."
During individual voir dire of the prospective jurors, Juror Jeffrey Quinn indicated that he "read the paper pretty regularly and crime reports in the paper." He recalled having read something about this case in particular because it occurred in Pinson, "out towards Center Point," presumably where Juror Quinn lived. When questioned about his opinion as to appellant's guilt and whether he could lay aside any previous impressions concerning appellant's case, Juror Quinn's answers were initially somewhat equivocal; i.e., "you don't get there without doing nothing," and "yes, I believe I can [afford defendant the presumption of innocence]."
Appellant appears to argue that, in light of our Surpeme Court's decisions in Ex parte Beam, 512 So.2d 723 (Ala. 1987), and Ex parte Rutledge, 523 So.2d 1118 (Ala. 1988), this juror's responses indicated that he held strong and deep impressions which would close his mind against the testimony given at trial. We disagree. It is true that, just as in Beam, Juror Quinn's responses, "when taken out of context and standing alone, . . . appear to be expressions of equivocation." Beam,supra, 512 So.2d at 724. As Beam requires, however, a juror's responses must be "viewed in full context and as a whole." Id.
When Juror Quinn's responses are viewed in full context, it becomes readily apparent that he was fully able to lay aside any previous impressions and render a verdict based solely on the evidence presented at trial. Indeed, when asked if there was any question in his mind whether he could afford defendant the presumption of innocence, Juror Quinn responded, "No." *Page 101 
A trial court's decision to disqualify or not to disqualify a prospective juror based on a challenge grounded on bias is entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion. Thomas v.State, 539 So.2d 375, 388 (Ala.Cr.App.), aff'd, 539 So.2d 399
(Ala. 1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201,105 L.Ed.2d 709 (1989). Based on the foregoing, we conclude that no such abuse occurred in the instant case.
Appellant also contends that he received an incomplete trial transcript, thus making it impossible to receive a fair appellate review of the voir dire proceedings. Specifically, appellant alleges that the incomplete nature of the transcript prevents him from determining whether the prosecutor complied with the mandate of Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
This contention must fail for two reasons. First, as the supplemental record shows, this transcript is a complete record of the proceedings below. Thus, this assertion is factually incorrect. Second, because appellant is white, he has no standing under Batson, supra, to challenge the removal of blacks from his jury. As this Court has previously held, "the rule of Batson does not apply in cases where black veniremen are removed from the jury of a white defendant." Smith v.State, 515 So.2d 149, 150 (Ala.Cr.App. 1987). Therefore, this assertion must also fail.
 II
Appellant next contends that he was denied his constitutional rights to due process of law and a fair trial. Specifically, he argues that: 1) he received an incomplete trial transcript, thus making it impossible for him to receive a fair appellate review of his conviction; and 2) the current indigent system of appointing attorneys, which provides a statutory level of compensation for appointed attorneys, deprived him of a fair trial and appellate review. Our review of the record, however, convinces us that appellant was not deprived of his constitutional rights, either by the record provided him on appeal or by the statutory limit on compensation to his counsel.
As we have stated earlier, appellant's claim that he was provided with an incomplete record is factually incorrect. The supplemental record provided to this Court clearly shows that this transcript is a complete record of the proceedings below. Thus, this contention must fail.
Appellant further contends, however, that his right to equal protection is violated by the statutory system for payment of attorneys of indigent defendants in capital cases. This argument has previously been advanced and rejected. In Ex parteGrayson, 479 So.2d 76, 79-80 (Ala.), cert. denied,474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), our Supreme Court held that the compensation-of-counsel statute, § 15-12-21, Codeof Alabama 1975, which sets the rate of compensation, does not deprive an indigent defendant of due process or equal protection in its application to capital cases, despite the contention that attorneys will not provide effective assistance unless paid a certain amount of money. See also Duren v. State,507 So.2d 111, 119 (Ala.Cr.App. 1986), aff'd, 507 So.2d 121
(Ala. 1987), cert. denied, 484 U.S. 905, 108 S.Ct. 249,98 L.Ed.2d 206 (1988). Thus, this contention must also fail.
 III
The appellant further contends that the trial court erred in admitting the testimony of James Davenport concerning a conversation he heard between Gary Leon Brown and James Bynum. The appellant argues that the testimony was hearsay and that the admission of such testimony prejudiced him in the eyes of the jury.
The conversation between Brown and Bynum occurred in Davenport's automobile while Davenport was driving to the victim's home. Bynum was in the front seat. Brown and the appellant were seated in the rear passenger seats. Davenport testified that he heard Brown and Bynum "talking about going and killing a queer" and that all Davenport would have to do was drive. *Page 102 
The State argues, and we agree, that the appellant's argument must be rejected because Davenport's testimony was admissible under two separate theories. The first theory is that the conversation between Brown and Bynum was not hearsay. Hearsay is any out-of-court statement "offered as tending to prove the truth of the matter stated." C. Gamble, McElroy's AlabamaEvidence, § 242.01(1) (3rd ed. 1977). The significance of this conversation was that it occurred, not that the matters asserted therein were true. This Court has stated on numerous occasions that the hearsay rule applies only to a statement offered for the truth of its contents. Tillis v. State,469 So.2d 1367, 1370 (Ala.Cr.App. 1985); Dent v. State,423 So.2d 327, 328 (Ala.Cr.App. 1982); Epps v. State, 408 So.2d 562, 564
(Ala.Cr.App. 1981); Crews v. State, 375 So.2d 1291, 1294
(Ala.Cr.App. 1979).
Both at trial and in his earlier statement to the police, appellant denied any knowledge that a killing was planned. He claimed, instead, that he accompanied Brown, Bynum, and Davenport to the victim's trailer with the understanding that they were going to commit a robbery. However, the conversation between Brown and Bynum about "going and killing a queer," made in the appellant's presence, established that he did have knowledge of an intent to kill, at least on the part of Brown and Bynum. Knowledge of the plan to kill McGraw was also relevant to the issue of whether the appellant was guilty of an intentional killing, an element of the capital offense. This issue, however, will be addressed in Part IV of our opinion.
Moreover, Davenport's testimony was admissible under the theory that it was the statement of coconspirators made in the course of a conspiracy. In Leonard v. State, 459 So.2d 970, 972
(Ala.Cr.App. 1984), we stated that "any act or statement of a co-conspirator, done or made before the commission of a crime, during the existence of a conspiracy, and in furtherance of the plan or design, is admissible against the accused." Furthermore, only prima facie evidence of the conspiracy is necessary before such a statement can be received into evidence. Lewis v. State, 414 So.2d 135, 140 (Ala.Cr.App.),cert. denied, 414 So.2d 140 (Ala. 1982).
The evidence shows that at the time of the conversation between Brown and Bynum, there was a conspiracy among Brown, Bynum and the appellant to, at the very least, rob the victim McGraw. The statement of Bynum and Brown about "killing a queer" was in furtherance of the already existing conspiracy because it was a discussion of their plans for disposing of McGraw. Therefore, the testimony of Davenport was admissible against the appellant.
 IV
Appellant next argues that he should not have been convicted of capital murder, because, he argues, the State failed to prove that he had the intent to kill the victim. The appellant cites Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368,73 L.Ed.2d 1140 (1982), for the proposition that a finding of intent to kill is a necessary element for the imposition of a death sentence. As the United States Supreme Court stated inEnmund, "the focus must be on his culpability, not on that of those who committed the robbery . . . for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence,' which means we must focus on 'relevant facets of the character and record of the individual offender.' " 458 U.S. at 798, 102 S.Ct. at 3377 (citations omitted). Factually, Enmund is distinguishable from the present case. In Enmund, the Court stated, "The record before us does not warrant a finding that Enmund had any intention of participating in or facilitating a murder." Id. Such is not the case in the present action.
A death sentence is authorized in Alabama only if the appellant has some specific intent to kill the victim. See §§ 13A-2-23, 13A-5-40(a)(2), (b), (c), (d), 13A-6-2(a)(1). Codeof Alabama 1975. As the Supreme Court stated in Woodson v.North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, *Page 103 
2991, 49 L.Ed.2d 944 (1976), "[d]eath, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."
Thus, for an individual to be sentenced to death, that individual must have a "particularized intent to kill." SeeKennedy v. State, 472 So.2d 1092 (Ala.Cr.App. 1984), aff'd,472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340,88 L.Ed.2d 325 (1985). However, before we make this determination, a two-part test must be applied. " 'To affirm a finding of a "particularized intent to kill," the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill.' " Kennedy v.State, 472 So.2d at 1105, quoting Ex parte Raines,429 So.2d 1111, 1113 (Ala. 1982), cert. denied, 460 U.S. 1103,103 S.Ct. 1804, 76 L.Ed.2d 368 (1983).
With regard to the first requirement set out inKennedy, the trial court gave the following instructions relating to intent:
 "Now, the State does not profess to prove conclusively that Bankhead, individually or personally, inflicted the injuries, or certainly not all of the injuries, to the deceased. You should know that it is not necessary for the State to prove capital murder that Defendant Bankhead personally inflicted the wounds or any particular wounds to the deceased.
 "What the State must prove, you see, is that Bankhead had a particularized intent to kill McGraw, and/or that he sanctioned and facilitated the commission of the intentional killing type during the course of a robbery.
 "An intentional killing, folks — and this is the core difference between felony murder and capital — an intentional killing is a necessary requisite or requirement for a conviction of a capital offense. The killing cannot be the result of accident or recklessness or negligence. The killing, again, must be intentional or purposeful killing.
 "Now, what are we talking about when we talk about co-defendants acting in concert, or accomplice liability? The legal theory or rule is what we are talking about, is that one is legally accountable for the behavior of another who commits a criminal offense, if, with the intent to promote or assist the commission of the offense, he aids or abets such other person in the commission of the offense.
 "The accomplice liability doctrine may be used to convict one of a capital offense who does not actually deal the lethal blow, or deal a blow at all, for that matter, but who is an accomplice, if the State proves beyond a reasonable doubt or to a moral certainty that the Defendant Bankhead was an accomplice in the intentional killing as opposed to being an accomplice in the underlying robbery felony.
 "The burden is on the State to prove beyond a reasonable doubt and to a moral certainty that the defendant was an accomplice and that there was a previous understanding by prearrangement or on the spur of the moment, or just prior to the killing that the defendant had knowledge of the intentional killing.
 "The State must prove that the accomplice was prepared to kill, intended to kill, or attempted to kill, or intended that the killing take place, or that lethal force would be employed against the victim; 'lethal,' meaning deadly."
The trial court thoroughly instructed the jury on the particularized intent necessary to find the appellant guilty of murder and to sentence him to death. Thus, the first requirement of Kennedy was met.
Having determined that the jury was correctly charged on intent, we must now turn our focus to whether the jury had before it sufficient evidence from which it could determine that Bankhead possessed the requisite "particularized intent to kill." Kennedy, 472 So.2d at 1105. *Page 104 
 " ' "In reviewing the sufficiency of the evidence the appellate courts of this State are bound by several well settled rules. It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt and to a moral certainty. Instead, the function of this Court is to determine whether there is legal evidence from which a jury could by fair inference find the defendant guilty. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.), cert. denied, 368 So.2d 877 (Ala. 1979); Scruggs v. State, 359 So.2d 836, 842 (Ala.Cr.App.), cert. denied, 359 So.2d 843 (Ala. 1978).
 " ' "In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State and accord the State all legitimate inferences therefrom. Ellis v. State, 338 So.2d 428 (Ala.Cr.App. 1976); Edson v. State, 53 Ala. App. 460, 301 So.2d 226 (1974). The evidence must be considered in the light most favorable to the prosecution. Colston v. State, 57 Ala. App. 4, 325 So.2d 520 (1975), cert. denied, 295 Ala. 398, 325 So.2d 531 (1976).
 " ' "Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Bell v. State, 339 So.2d 96
(Ala.Cr.App. 1976). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust. Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969); Morton v. State, 338 So.2d 423 (Ala.Cr.App. 1976). There is a presumption in favor of the correctness of a jury's verdict, and when the trial judge declines to grant a new trial that verdict is strengthened on appeal. Tolliver v. State, 50 Ala. App. 654, 658, 282 So.2d 92 (1973)." '
 "Freeman v. State, 505 So.2d 1079 (Ala.Cr.App. 1986), quoting Johnson v. State, 378 So.2d 1164, 1169 (Ala.Cr.App. 1979), writ quashed by Ex parte Johnson, 378 So.2d 1173 (Ala. 1979)."
Anderson v. State, 542 So.2d 292, 295-96 (Ala.Cr.App. 1987),cert. quashed, 542 So.2d 307 (Ala. 1989).
The record reflects that the appellant admitted going to the victim's trailer to take his property. In the car on the way to the victim's trailer, two of the other individuals stated that they were going to kill "a queer." Also, the appellant asked Bynum if he could knock the victim out with one punch. The appellant stated that if Bynum could not, then he could. Davenport, a witness for the State, testified that when the victim came upon them at his house, he saw the appellant grab him from behind and throw him to the ground. He witnessed all three men beat the victim and then drag him inside the trailer. Davenport further stated that when the appellant left the trailer several moments later he saw Davenport and told him to shut up or he would "get the same as the old man." Davenport testified that the appellant was carrying a stereo at the time and had blood "all over him." Blood was on the appellant's "arms, his hands, and his face and his clothes." After the men left the victim's house, they went to the appellant's residence. The appellant told the others that they had to burn their clothes, which they did.
The appellant's wife testified that she heard the men talking as they unloaded the electronic equipment and appliances at the appellant's house. She said she heard the appellant say to Brown, "Are you sure he's dead? Are you sure he's dead" . . . "Are you sure? We've got to make sure he was dead." The appellant's wife further testified that Brown said, "And Archie [the appellant] handed me the knife, said you have to cut his throat." The appellant then stated, "You weren't doing it right. I had to take the knife and slice his jugular vein." The wife further testified that on the evening of the murder, the appellant was boiling a knife in a pot of water on the stove.
We find, therefore, that there was sufficient evidence from which the jury could *Page 105 
conclude that the appellant intended to kill the victim. Thus, the appellant's death sentence did not violate the rule ofEnmund v. Florida.
 V
Appellant also contends that various remarks made by the prosecutor during both the guilt phase and the sentencing phase of his trial constituted reversible error.
Our examination of the record reveals that there were no objections made at trial to the matters of which appellant now complains. Thus, this issue was not preserved at trial. However, appellant's failure to preserve this issue, "while weighing against defendant as to any possible claim of prejudice, serves as no impediment to our scope of review pursuant to the 'plain error' mandate in death penalty cases."Ex parte Bush, 431 So.2d 563, 565 (Ala.), cert. denied,464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). Therefore, we must now consider whether the prosecutor's remarks constituted "plain error." Our Supreme Court has adopted federal case law defining plain error, holding that "[p]lain error only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert.denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). It is only where a particularly egregious error occurs at trial that the plain error standard is applied. Ex parte Harrell,470 So.2d 1309, 1313 (Ala.), cert. denied, 474 U.S. 935,106 S.Ct. 269, 88 L.Ed.2d 276 (1985). We have applied this standard to prosecutorial argument. Murry v. State, 562 So.2d 1348, 1353
(Ala.Cr.App. 1988).
Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State,357 So.2d 397, 399 (Ala.Cr.App. 1978), and that court is given broad discretion in determining what is permissible argument.Hurst v. State, 397 So.2d 203, 208 (Ala.Cr.App.), cert. denied,397 So.2d 208 (Ala. 1981). Moreover, this Court has stated that it will not reverse unless there has been an abuse of that discretion. Miller v. State, 431 So.2d 586, 591 (Ala.Cr.App. 1983).
Whatever is in evidence is considered subject to legitimate comment by counsel. Ward v. State, 440 So.2d 1227, 1230
(Ala.Cr.App. 1983); Spears v. State, 402 So.2d 1073, 1076
(Ala.Cr.App.), cert. denied, 402 So.2d 1078 (Ala. 1981); Watsonv. State, 398 So.2d 320, 328 (Ala.Cr.App. 1980), cert. denied,398 So.2d 332 (Ala. 1981), cert. denied, 452 U.S. 941,101 S.Ct. 3085, 69 L.Ed.2d 955 (1981). The prosecutor, like defense counsel, has the right to present his impressions from the evidence, and he may argue every matter of legitimate inference and may examine, collate, sift, and treat evidence in his own way. Sanders v. State, 423 So.2d 348, 352 (Ala.Cr.App. 1982).
Here, the State argues, and we agree, that the evidence established that the appellant, both in his statement (introduced by the State) and in his own testimony before the jury, admitted that he had gone to the victim's trailer with the intent to steal his property, but he adamantly denied any participation in the killing of McGraw or any intention that McGraw be killed. The State's evidence that the appellant was actively involved in the killing came primarily from Jimmy Davenport and Blanche Bankhead. Appellant sought to discredit these witnesses through cross-examination. Appellant's credibility was therefore a fundamental issue for the jury's determination. Accordingly, a substantial portion of the State's argument was devoted to persuading the jury that Blanche Bankhead and Jimmy Davenport were more credible witnesses than the appellant and that the evidence was more consistent with their version of the events. The credibility of a witness is a legitimate subject for criticism and discussion by either party during closing arguments. Adams v. State,484 So.2d 1143, 1146 (Ala.Cr.App. 1985). Moreover, the prosecutor, in the appropriate case, may use opprobrious terms to characterize the accused or his conduct, provided that the remarks are in accord with the evidence. Nicks v. State,521 So.2d 1018, 1023 (Ala.Cr.App. 1987), aff'd, 521 So.2d 1035
(Ala.), cert. denied, 487 U.S. 1241, *Page 106 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988). The prosecutor's references to appellant as a "liar," therefore, were supported by the evidence and thus do not constitute error.
Appellant further argues that the prosecutor erred in describing him as a "ringleader" and in mentioning his black belts in karate. The State has pointed out in brief, that while the prosecutor made numerous references to appellant as a "leader," it was unable to find where appellant was referred to as a "ringleader." We have also searched the record and have failed to find any instance where the prosecutor referred to appellant as a "ringleader." In any event, either term was a correct description of the appellant. Basically, appellant's testimony was that he simply acquiesced in Brown and Bynum's suggestion to rob McGraw, but that he never anticipated killing McGraw. The State argued in response that the fact that appellant was older than the other men, that he was experienced in karate, and that he had a criminal record indicated, instead, that he was a leader rather than a follower in the group, and that he fully participated in all aspects of the crime. We find, therefore, that the prosecutor's reference to appellant as a "leader" and the mention of appellant's expertise in karate were appropriate and legitimate inferences from the evidence. Sanders v. State, supra, 423 So.2d at 352.
Appellant also complains that the prosecutor described him as a "bum," "vermin," a "punk," and a "gutless wonder." As previously stated, however, arguably derogatory or opprobrious characterizations are not improper when they are based on the evidence. Nicks v. State, supra, 521 So.2d at 1023. As pointed out by the State, the evidence was that appellant had quit his job shortly before the murder and was stealing electricity from the power company. Furthermore, the evidence suggested that appellant had conspired with the much younger Brown and Bynum to rob and kill a defenseless 60-year-old man, and that the killing had been done in a particularly vicious and brutal manner. While we do not particularly approve of the precise words used by the State in its closing argument, they were, nevertheless, an accurate description of the appellant based on the evidence presented by the State.[2]
Moreover, as the State points out, even if this language was improper, such arguably derogatory characterizations are not the basis for a mistrial. Saranthus v. State, 501 So.2d 1247,1252-53 (Ala.Cr.App. 1985), rev'd on other grounds,501 So.2d 1256 (Ala. 1986) (defendant called a "bum"). See also Ringer v.State, 501 So.2d 493, 495 (Ala.Cr.App. 1986) (defendant called a "snake"). Because the "plain error" standard of review, where reversal is required only for egregious error, is similar to the standard applied to a motion for mistrial, there should be no reversal here.
Additionally, the State argues, and we agree, that two other factors argue against any finding of plain error. First, these remarks were interspered in a very long closing argument. Second, the complained-of remarks all occurred in the State's initial closing argument; the State's rebuttal argument contained none of these remarks. In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State,509 So.2d 252, 256 (Ala.Cr.App. 1987); Wysinger v. State,448 So.2d 435, 438 (Ala.Cr.App. 1983); Carpenter v. State, 404 So.2d 89,97 (Ala.Cr.App. 1980), cert. denied, 404 So.2d 100 (Ala. 1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016
(Ala.Cr.App. 1984); *Page 107 Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App. 1982). For these reasons, we find it unlikely that any impropriety in the State's argument could have affected the jury's verdict.
In judging a prosecutor's closing argument, the standard is whether the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process."Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471,91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo,416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). In Darden, the United States Supreme Court found no due process violation despite the prosecutor's repeatedly expressing his personal wish that the defendant had been killed during the crime.477 U.S. at 180 n. 12, 106 S.Ct. at 2471 n. 12. Likewise, for the reasons set out above, we conclude that the prosecutor's closing argument during the guilt phase of appellant's trial did not deny the appellant a fair trial. We must now determine whether his remarks during the sentencing phase constitute plain error.
Both the appellant and the State recognize that our decision in Rutledge v. State, 523 So.2d 1087 (Ala.Cr.App. 1987), rev'don other grounds, 523 So.2d 1118 (Ala. 1988), is dispositive of this issue. Appellant argues that the prosecutor violated the holding of Rutledge by his opening statement at the sentencing phase of the trial. The State contends otherwise. In Rutledge, the parties agreed before closing argument that the State would argue the existence of two aggravating circumstances and that the defendant would argue the existence of seven nonstatutory mitigating circumstances. In closing argument, the State then went down the list of statutory mitigating circumstances, contending that none of these applied. The defendant argued on appeal that the State had urged that the nonexistence of any statutory mitigating circumstances should be weighed as aggravation. This Court rejected that interpretation of the argument, holding:
 "While we do not necessarily approve of this type of prosecutorial argument, we do not find it improper in this case when viewed in the context of the jury argument as a whole. The prosecutor did not argue that the lack of evidence of statutory mitigation should be considered by the jury as an aggravating circumstance. Nor do we believe that he intended to make such an argument. It appears that the argument was simply a way of leading into a discussion of the facts in evidence and reasonable inferences to be drawn therefrom. Under the circumstances, and particularly in view of the court's oral charge, we do not believe that the jury was misled by the prosecutor's approach or reached the conclusion urged by appellant."
523 So.2d at 1097.
There is even less reason for finding improper argument in the case at bar. Nothing in the record suggests that there was any prior discussion between the prosecutor and defense counsel concerning what mitigation appellant would seek to prove. The trial court began the sentencing hearing by reading to the jury the list of statutory mitigating circumstances. The court then informed the jury that it could also consider as a nonstatutory mitigating circumstance anything about appellant's character or record, or anything about the circumstances of the crime. In his opening statement, the prosecutor began his remarks on mitigation with the following:
 "The mitigating circumstances in this case, as the Judge has told you, are anything you care to consider, quite frankly. I'll go over them briefly, just as an opening and tell you what I think of them in terms of how they apply to this case. If you agree with me, fine. If you don't then that is a reason for you to say, no, Archie Bankhead does not deserve to die in the electric chair. I ask you to examine them."
The prosecutor then went down the list of statutory mitigating circumstances, arguing that there was no evidence of these circumstances. The State argues that, the prosecutor's argument was not that the lack of mitigation should be weighed as aggravation, but rather, that there simply was no mitigation. We agree. We further *Page 108 
find no violation of Rutledge by this argument.
Appellant also argues that the prosecutor argued improperly in suggesting to the jury that intoxication was not a mitigating circumstance. Our review of the record, however, reveals that the prosecutor's actual argument was that intoxication should not be the basis for finding a particular mitigating circumstance, i.e., that the defendant was under the influence of extreme mental or emotional disturbance at the time of the crime. § 13A-5-51(2), Code of Alabama 1975. Although we have never reached this precise issue, this Court has previously held that, depending on the particular circumstances involved, voluntary intoxication may not constitute a ground for finding a related mitigating circumstance — § 13A-5-51(6), Code of Alabama 1975 — that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Thompson v. State, 503 So.2d 871,881 (Ala.Cr.App. 1986), aff'd, 503 So.2d 887 (Ala.), cert.denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987). The decision in Thompson was based on the fact that defendant's intoxication was voluntary and that he could clearly remember the material events of the offense: "The appellant simply did not show that he was so intoxicated as to have rendered himself incapable of appreciating his conduct." Thompson,503 So.2d at 881. The same factors apply here. However, Thompson should not be interpreted as standing for the proposition that intoxication may never be the basis of the mitigating circumstance found in § 13A-5-51(2).
Appellant next argues that the prosecutor's remarks violated the doctrine of Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954,57 L.Ed.2d 973 (1978); Eddings v. Oklahoma, 455 U.S. 104,102 S.Ct. 869, 71 L.Ed.2d 1 (1982); and Skipper v. South Carolina,476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). As the State correctly points out, these cases establish that the sentencing authority cannot be precluded from considering as mitigation any aspect of a defendant's character or record, or any of the circumstances of the offense. The State argues, and we agree, that the complained-of remarks here did not violate this rule for two reasons. First, the prosecutor did not argue that intoxication should not be a mitigating circumstance at all. He simply argued that it should not support a finding of a particular mitigating circumstance — § 13A-5-51(2). Any aspect of the crime may be considered as mitigation under § 13A-5-52,Code of Alabama 1975, and the prosecutor did not argue to the contrary. Indeed, the above-excerpted portion of the prosecutor's remarks supports this finding. Second, in any event, the prosecutor's argument did not preclude the jury's consideration of intoxication as a mitigating circumstance. At most, he argued that the jury should find that intoxication was not a mitigating circumstance. While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority. Cochran v. State,500 So.2d 1161, 1176-77 (Ala.Cr.App. 1984), aff'd in part,remanded on other grounds, 500 So.2d 1179 (Ala. 1985), aff'd onreturn to remand, 500 So.2d 1188 (Ala.Cr.App.), aff'd,500 So.2d 1064 (Ala. 1986), cert. denied, 481 U.S. 1033,107 S.Ct. 1965, 95 L.Ed.2d 537 (1987).
Finally, appellant contends that the trial court erred in allowing the prosecutor to express his personal opinions in arguments to the jury. Specifically, appellant points out two portions of the prosecutor's argument which he deems improper. The first is as follows:
 "That is a death penalty case, and if that is not a death penalty case, there has never been one in this state, nor will there ever be one."
This type of argument, however, involves no personal expression of opinion, but rather, is simply an argument of an advocate. Generally, a prosecutor's statements "which are merely arguendo of his opinion of the case, are within the limits of allowable forensic discussion." Owens v. State, 291 Ala. 107,278 So.2d 693, 696 (1973). *Page 109 
The second complained-of portion is as follows:
 "We are asking you to do it because this type of crime, my personal belief, needs to have the ultimate punishment imposed."
Attorneys, particularly prosecutors, should be careful in arguments to the jury to refrain from injecting their own personal belief, experience, or knowledge in support of an argument, as distinguished from what they deem to be reasonable inferences to be drawn from the evidence. Brown v. State,393 So.2d 513, 516 (Ala.Cr.App. 1981). Thus, the prosecutor should not have made this remark. Despite this, however, we find that the fact that the remark was made does not require reversal. As has been previously noted, because no objection was made to this remark, a reversal would have to be based on the plain error rule, which requires a finding of manifest injustice. The State argues, and we agree, that the prosecutor's remark was an isolated one, coming not in closing argument, but at the very beginning of the State's introductory remarks and before any evidence had been presented at the sentencing phase of appellant's trial. Furthermore, the remainder of the introductory remarks and the closing arguments addressed the existence of aggravating and mitigating circumstances and their relative weight, certainly the proper focus in determining the appropriate sentence to be imposed.
Isolated remarks, even in the arguments made in the sentencing phase of capital murder trials, are to be viewed with leniency. Brooks v. Kemp, 762 F.2d 1383, 1400 (11th Cir. 1985), vacated and remanded on other grounds, 478 U.S. 1016,106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), reinstated on remand,809 F.2d 700 (11th Cir.), cert. denied, 483 U.S. 1010,107 S.Ct. 3240, 97 L.Ed.2d 744 (1987). In view of the overwhelming evidence in favor of a death sentence, when combined with the brief and isolated nature of this remark, we do not find this remark sufficiently egregious to constitute plain error. Thus, no basis for reversal exists.
 VI
Appellant's final contention of error is that the trial court erred in allowing the prosecutor, during the testimony of the medical examiner, to illustrate the nature of the victim's wounds by use of 17 photographic slides of the victim's body. Appellant argues that these slides were irrelevant, inflammatory, inaccurate, misleading, and cumulative, and that the trial court should not have allowed the medical examiner to use them as an aid to his testimony.[3]
Generally, photographs are admissible into evidence in a criminal prosecution "if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge."Magwood v. State, 494 So.2d 124, 141 (Ala.Cr.App. 1985), aff'd,494 So.2d 154 (Ala. 1986), cert. denied, 479 U.S. 995,107 S.Ct. 599, 93 L.Ed.2d 599 (1986). See also Woods v. State,460 So.2d 291 (Ala.Cr.App. 1984); Washington v. State,415 So.2d 1175 (Ala.Cr.App. 1982); C. Gamble, McElroy's Alabama Evidence
§ 207.01(2) (3d ed. 1977).
It has long been the law in Alabama that "[p]hotographs which show external wounds in the body of a deceased victim, even though they are cumulative and based on undisputed matters, are admissible. The fact that they are gruesome is not grounds to exclude them so long as they shed light on the issues being tried." Burton v. State, 521 So.2d 91, 92 (Ala.Cr.App. 1987). See also Kinder v. State, 515 So.2d 55 (Ala.Cr.App. 1986). The fact that a photograph is gruesome and ghastly is no reason to exclude it from the evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph *Page 110 
may tend to inflame the jury. Magwood v. State, supra,494 So.2d at 141. See also Hutto v. State, 465 So.2d 1211
(Ala.Cr.App. 1984); Jones v. State, 439 So.2d 776 (Ala.Cr.App. 1983); Godbolt v. State, 429 So.2d 1131 (Ala.Cr.App. 1982).
This rule of law applies not only to photographs, but to photographic slides as well. Goffer v. State, 430 So.2d 896
(Ala.Cr.App. 1983). In Goffer, we wrote as follows:
 "The appellant also objects to the introduction of the photographs because they were slides and therefore produced a magnification of the wounds and a distortion of the injuries. This court stated in Metcalf v. State, 40 Ala. App. 25, 108 So.2d 435 (1958) that:
 " 'Gruesomeness becomes objectionable in a photograph only where there is distortion of either of two kinds; first, distortion of the subject matter as where necroptic or other surgery causes exposure of nonprobative views, e.g., "massive mutilation," McKee v. State, 33 Ala. App. 171, 31 So.2d 656; or second, focal or prismatic distortion where the position of the camera vis-a-vis the scene or object to be shown gives an incongruous result, e.g., a magnification of a wound to eight times its true size, Wesley v. State, 32 Ala. App. 383, 26 So.2d 413.'
 "Braswell v. State, 51 Ala. App. 698, 701, 288 So.2d 757 (1974).
 "Neither of these distortions existed in this case. The slides were just enlargements of photographs and the wounds were shown in relation to the deceased. The slides gave the jury a better understanding of the nature and gravity of the deceased's injuries, and we do not believe the slides distorted the injuries or misled the jury in any way."
430 So.2d at 898-99.
Appellant contends that the slides, which depict the various stab and slice wounds to the victim's body, were irrelevant to the sentencing hearing. We disagree. As pointed out by the State, one of the aggravating circumstances which the State sought to prove at sentencing was that this capital offense was particularly heinous, atrocious, or cruel in comparison with other capital offenses. § 13A-5-49(8), Code of Alabama 1975. This aggravating circumstance is limited "to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." Ex parte Kyzer, 399 So.2d 330, 334
(Ala. 1981). Death by multiple stabbing satisfies this standard. Dunkins v. State, 437 So.2d 1349, 1356 (Ala.Cr.App.),aff'd, 437 So.2d 1356 (Ala. 1983).
Moreover, the trial court explicitly charged the jury prior to the slide presentation that the slides were being shown for the sole purpose of determining whether this particular aggravating circumstance existed, and were not intended to inflame the jury. The prosecutor also made this clear in his remarks to the jury. Also, the jury was instructed, as part of the trial court's oral charge, that there was no room for the influence of passion, prejudice, or other arbitrary factors in the sentencing decision.
Appellant also contends that the slides were misleading to the jury because they revealed postmortem sloughing of skin and other signs of decomposition. Specifically, he argues that the slides revealed "circumstances of death that had nothing to do with the defendant's character, the nature of the crime, or an appropriate sentence." However, this evidence of decomposition was entirely separate from the stab wounds to which the jury's attention was focused, and the medical examiner carefully pointed out to the jury these other factors and identified them as being due to post-mortem deterioration of the body. Thus, we see no reason for the jury to have been misled by this aspect of the slides.
Appellant further argues that, because several slides showed wounds into which probes had been inserted, the slides did not accurately depict the wounds. The State argues, and we agree, that while probes were shown in some wounds, they were inserted for the sole purpose of illustrating the depth and nature of the wounds, relevant factors in determining whether the crime was especially heinous, atrocious, or cruel. The probes were consistently pointed *Page 111 
out to the jury, and their function was explained. Moreover, the use of the probes did not distort the size of the wounds so that they appeared larger than they actually were; thus, this case is distinguished from Wesley v. State, 32 Ala. App. 383,26 So.2d 413 (1946). Therefore, the jury could not have been misled by the insertion of probes into certain of the wounds.
Finally, appellant argues that the slide presentation should not have been allowed because the slides were cumulative of the photographs, which were received into evidence. As we stated above, however, such evidence is "admissible even though they are cumulative evidence based on an undisputed matter."Kinder v. State, supra, 515 So.2d at 64. Moreover, as the medical examiner explained to the trial judge, the nature of the wounds was more easily explained to the jury through the use of the slides instead of the photographs.
Thus, for the above-stated reasons, the trial court correctly allowed the use of slides during the sentence hearing to aid the testimony of the medical examiner.
 VII
As required by Beck v. State, 396 So.2d 645 (Ala. 1980), and § 13A-5-53, Code of Alabama 1975, we have reviewed this case for any error involving the defendant's conviction and the propriety of his death sentence.
The defendant, Grady Archie Bankhead, was indicted for and convicted of murder during a robbery, an offense which is punishable by death. § 13A-5-40(a)(2), Code of Alabama 1975.
There is no suggestion in the record that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Indeed, the trial court very specifically instructed the jury to avoid such influences. Moreover, the trial judge praised the attorneys in his sentencing order for not attempting to influence the jury in this, and specifically found that these factors did not affect the jury's sentence recommendation. We, likewise, find no evidence to support any such contention.
Our review of the sentencing proceedings reveals that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence. The trial court found the existence of two aggravating circumstances: First, that the capital offense was committed while the defendant was engaged in the commission of a robbery, § 13A-5-49(4), Code of Alabama 1975; and second, that the capital offense was especially heinous, atrocious, or cruel when compared with other capital offenses, § 13A-5-49(8), Codeof Alabama 1975. The application of this second circumstance is limited to those killings which are unnecessarily torturous to the victim. Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981). InDunkins v. State, 437 So.2d 1349, 1356 (Ala.Cr.App.), aff'd,437 So.2d 1356 (Ala. 1983), we held that death by multiple stabbing satisfies this standard. After considering each of the statutory mitigating circumstances set out in § 13A-5-51, Codeof Alabama 1975, and the possibility of any nonstatutory mitigating circumstances, as allowed by § 13A-5-52, Code ofAlabama 1975, the trial court found that no mitigating circumstances existed. This finding was also supported by the evidence.
Our independent weighing of the aggravating and mitigating circumstances convinces us of the propriety of the death sentence in this case.
Moreover, we are convinced that the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Indeed, fully two-thirds of Alabama death sentences have been imposed on defendants convicted of capital murder arising out of robbery-homicide. Beck v. State, supra, 396 So.2d at 654 n. 5. See also, e.g., Hinton v. State, 548 So.2d 547 (Ala.Cr.App. 1988), aff'd, 548 So.2d 562 (Ala. 1989); Bell v. State,475 So.2d 601 (Ala.Cr.App. 1984), aff'd, 475 So.2d 609 (Ala.),cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585
(1985); Jones v. State, 456 So.2d 366 (Ala.Cr.App. 1983),aff'd, 456 So.2d 380 (Ala. 1984), cert. denied, 470 U.S. 1062,105 S.Ct. 1779, 84 L.Ed.2d 838 (1985). *Page 112 
Finally, we have searched the entire record for any plain error or defect which might have adversely affected the defendant's substantial rights and have found none. Rule 45A, Alabama Rules of Appellate Procedure.
The appellant received a fair and impartial trial. Therefore, his conviction for this capital offense and his sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All the Judges concur.
[1] Gary Leon Brown and James Lynn Bynum were also charged with capital murder in the robbery-homicide of Jack David McGraw. Brown was convicted of capital murder and was sentenced to death. Bynum was convicted of the lesser included offense of murder and was sentenced to life imprisonment. Both convictions were upheld on appeal. Brown v. State, 545 So.2d 106
(Ala.Cr.App. 1988), aff'd, 545 So.2d 122 (Ala. 1989); Bynum v.State, 527 So.2d 177 (Ala.Cr.App. 1988).
[2] Appellant also alleges that the prosecutor referred to him as a "fat little kid." We have reviewed the record and can find no instance where the prosecutor referred to appellant as such. The prosecutor, did, however, refer to State's witness Jimmy Davenport as a "fat little kid" during closing argument.
[3] We note that these slides were not admitted into evidence. Instead, photographs which are exact duplicates of the slides — State's exhibits 70-78 and 81-88 — were received into evidence and are a part of the record, which we have carefully reviewed. We further note that these same slides were shown at the trial of appellant's co-defendant Gary Leon Brown.